<pre>
1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF OHIO
2                         EASTERN DIVISION

3    UNITED STATES OF AMERICA,        Case No. 1:13-cr-121

4              Plaintiff,             Youngstown, Ohio

5         vs.

6    MALEK M. AL MALIKI,              MONDAY, MARCH 11, 2013

7              Defendant.

8
                 TRANSCRIPT OF DETENTION HEARING PROCEEDINGS
9              BEFORE THE HONORABLE GEORGE J. LIMBERT
                 UNITED STATES MAGISTRATE JUDGE
10

11   APPEARANCES:

12   For the Government:       Michael A. Sullivan,
                               Assistant United States Attorney
13

14   For the Defendant:       David C. Jack, Esquire

15

16   For Pretrial Services:   Marsha Tetrick

17

18

19   Official Court Reporter: Sarah E. Nageotte, RDR, CRR, CBC
                               United States District Court
20                             801 West Superior Avenue
                               Court Reporters 7-189
21                             Cleveland, Ohio 44113
                               (216) 357-7186
22

23

24
     Proceedings recorded by mechanical stenography from a
25   digital audio recording, transcript produced by
     computer-aided transcription.
</pre>

1

2       **MONDAY, MARCH 11, 2013**

3

4

5       Agent Gabrielle Hagan

6

7               Direct Examination by Mr. Sullivan. . . . . . .   4

8               Cross-Examination by Mr. Jack . . . . . . . . .  11

9               Redirect Examination by Mr. Sullivan. . . . . .  21

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (Proceedings commenced at 9:20 a.m.)

 2                          - - -

 3              COURTROOM DEPUTY: ... for business, the

 4      Honorable George J. Limbert presiding.

 5              THE COURT:  Please be seated.

 6              COURTROOM DEPUTY:  Court calls Case No.

 7      1:13-cr-121, United States of America versus Malek M. Al

 8      Maliki.

 9              THE COURT:  Okay.  We're here for a detention

10      hearing.

11         Are we going to have opening statements?

12              MR. SULLIVAN:  No, Judge.

13         I'll waive opening statements and go right to the

14      witness.

15              MR. JACK:  I'll waive.

16              THE COURT:  Okay.  Is the Government prepared

17      to call their first witness?

18              MR. SULLIVAN:  Yes, Judge.

19         United States calls Agent Gabrielle Hagan.

20                   (Witness was sworn)

21              THE COURT:  How do you spell your

22      [unintelligible].  H --

23              THE WITNESS:  H-A-G-A-N.

24              THE COURT:  A?

25              THE WITNESS:  Yes.
```

1          THE COURT:  Go ahead.

2                    **DIRECT EXAMINATION**

3    **BY MR. SULLIVAN:**

4    **Q**     Good morning.

5    **A**     Good morning.

6    **Q**     By whom are you employed?

7    **A**     The Department of Homeland Security, Immigration and

8    Customs Enforcement, Homeland Security investigations.

9    **Q**     Sorry.  I didn't mean to cut you off.

10   **A**     That's okay.  It's a long title.

11   **Q**     In what capacity?

12   **A**     I'm a special agent.

13   **Q**     Are you familiar with the facts and circumstances

14   regarding the investigation of Malek M. Al Maliki?

15   **A**     Yes, I am.

16   **Q**     Can you tell us briefly about that.

17   **A**     Sure.

18          In approximately October of 2010, we received

19   information from the Department of State regarding

20   allegations of Mr. Al Maliki engaging in sexually explicit

21   conduct with his two minor sons in Damascus, Syria.

22   **Q**     And did you have an opportunity to investigate the

23   case?

24   **A**     I did.

25   **Q**     All right.  And just -- can you tell us some of

```
 1    what -- describe some of your investigation for us.

 2    A    Sure.

 3         So one of the -- one of the initial allegations

 4    were -- you know, in addition to the sexual conduct with the

 5    two minor sons, some of the other things were that there was

 6    domestic abuse with his wife, as well as, for instance, like

 7    he would walk around naked in the apartment, so with the

 8    women and the children.

 9         So in about May of 2011, I traveled to Mr. Al Maliki's

10    residence to interview him.

11    Q    And where is that located?

12    A    That's in Cleveland, Ohio.

13    Q    Okay.

14    A    So myself and another agent knocked on the door, and

15    there's a full, clear storm door, so he came to the door in

16    just his underwear, his, like, BVDs, and so, I explained

17    that -- you know, I asked to talk with him and if I could

18    come in, so he said sure, but he would put on a pair of

19    pants first, and so, he invited us in and we spoke to him in

20    his residence.

21    Q    All right.  And did you discuss with him the nature of

22    the allegations?

23    A    Yes, I did.

24    Q    All right.  And at that time, did he -- well, first of

25    all, did he -- did he indicate whether or not he had
```

1    traveled to Syria?

2    **A**     Yes.  He stated that he had traveled to Syria, to

3    Damascus, and that he stayed in the same apartment with his

4    wife and children and that he actually stayed in a private

5    room in the apartment.

6    **Q**     All right.  And did you ask him about the allegations

7    of the sexual abuse?

8    **A**     I did.

9    **Q**     And did he admit or deny that?

10   **A**     He denied all the allegations.

11   **Q**     All right.  And have you had an opportunity to

12   interview or witness an interview of the child in this case?

13   **A**     Yes, I have.

14   **Q**     The children in this case?

15   **A**     Yes.

16   **Q**     All right.  And have you also had an opportunity to

17   interview Mr. Al Maliki's wife?

18   **A**     Yes, I have.

19   **Q**     And can you just -- and I know -- if you can just,

20   again, give us briefly the nature of the allegations here.

21   **A**     Sure.

22         One of the specific allegations was that -- and this

23   is -- this was as a result of both the interview of his

24   oldest child and his wife, was that he was naked in one of

25   the rooms and he took his oldest child and undressed him and

 1    placed him on top of him, on top of his penis, on -- Al

 2    Maliki's placed a child on Al Maliki's penis and attempted

 3    to penetrate him anally and was restraining him with his

 4    hands around the child's shoulders and holding him down on

 5    his lap.

 6         The child screamed because he experienced pain and the

 7    mother came running in and basically kicked Mr. Al Maliki to

 8    get the child away from him.

 9    **Q**    Okay.  And when you say pain, he experienced pain in

10    his rectum?

11    **A**    In his -- in his buttocks area, yes.

12    **Q**    So he -- based on your investigation, it appears that

13    he did achieve some penetration from that?

14    **A**    Yes.  The child was very clear that he did feel pain

15    in his buttocks area.

16    **Q**    Okay.  And then, was there another incident with that

17    same boy?

18    **A**    Yes.  Approximately five minutes after that incident,

19    Mr. Al Maliki tried again to anally penetrate the oldest

20    child.

21    **Q**    Okay.  And then, was there also an allegation

22    regarding the younger boy?

23    **A**    Yes.

24    **Q**    And how old would he have been at that time?

25    **A**    He would have been about three.

1    **Q**    Okay.

2    **A**    And so, the child was still taking breast milk at the

3    time and was asking for milk from the mother.  She was busy

4    doing something and wasn't paying attention to him, and so,

5    Mr. Al Maliki stated -- pulled out his penis from his pants

6    and said, here's your breast, here's your milk, and the

7    child was going over there to put his mouth on Mr. Al

8    Maliki's penis when one of the women that also lived in the

9    apartment pulled him away.

10   **Q**    Okay.  All right.  Now, also, in the course of your

11   investigation, did you have an opportunity to confirm

12   through travel records whether or not Mr. Al Maliki did

13   travel to -- at about the time of these allegations?

14   **A**    Yes, he did, in fact.

15   **Q**    All right.  And have you had an opportunity to review

16   more of his travel records?

17   **A**    Yes, I have.

18   **Q**    All right.  Can you give us kind of a summary of the

19   type of travel that you've determined Mr. Al Maliki has

20   engaged in over the recent past.

21   **A**    Sure.

22        So in 2012, he was gone for about ten months and he

23   left in January, just on a one-way ticket from Chicago to

24   Jordan, but he came back from Kuwait, via London, in October

25   of that year.  So, again, about ten months outside of the

1    country.

2           In, let's see, 2010, he was gone from August through

3    November of 2010 and he was in Damascus, Syria at that time.

4           In 2009, he arrived to Detroit from the Netherlands

5    and he had stated during his entry into the U.S. that he had

6    been in Iraq for about five months.

7           Then, in 2008, he was inbound from Kuwait.

8           2007, he was inbound from Kuwait again.

9           2006, he was inbound from Morocco, and at that time,

10   he had departed -- he was gone about a month at that time.

11          And then, 2002, inbound from Montreal on Royal Air

12   Maroc from Casablanca.

13          And then, in 2001, he was inbound via a Royal

14   Jordanian Air flight.

15   **Q**    All right.  And did you -- through your interview with

16   his wife, did she note any unusual aspects of his travel?

17   **A**    She stated that he will go overseas and claim that

18   he's lost a passport and then get a new passport, which is

19   actually consistent with his last travel.  In 2012, he went

20   out on one passport, claimed that it was lost, and then came

21   back on a new passport.

22   **Q**    And was there also -- during that last time, was there

23   anything -- did you find anything unusual in his belongings?

24   **A**    He actually -- he had an itinerary for travel from

25   Beirut to -- for -- yeah, Beirut to Kuwait in another

1    person's name.  So I'm not -- it's not his name, but it's --

2    it's just an itinerary for travel for someone else's name.

3  **Q**    But that was on his person when he traveled?

4  **A**    Correct.  Yes.

5  **Q**    And that was observed during a [unintelligible]?

6  **A**    Yes.

7  **Q**    Now, have you also had an opportunity to interview any

8    of the neighbors of Mr. Al Maliki?

9  **A**    I have.  I've interviewed four different neighbors.

10  **Q**    And can you tell us the results of those interviews.

11  **A**    Sure.

12         In a nutshell, all of them basically say that he

13    leaves for about four to five months to go overseas and he

14    normally leaves during the wintertime, comes back in the

15    summertime.

16         But last year, different pattern.  He left like

17    around -- I think it was January or February and was gone

18    for a long period of time.  One of the neighbors said that

19    he had gone to Iraq during that time.

20  **Q**    Okay.  And did one of them even notice some -- a

21    situation with mail or have a conversation with the mail

22    carrier?

23  **A**    Yes.  And that's how they knew that he had been in

24    Iraq.

25         So the mail had been stacking up and a substitute mail

1    carrier came to this neighbor and asked them if the house

2    had been vacated or -- or if they knew anything about Mr. Al

3    Maliki's whereabouts and -- because -- because the mail had

4    been stacking up.

5         Shortly after that, someone came to Mr. Al Maliki's

6    looking for him and advised that neighbor that he was in

7    Iraq and he travels to Iraq frequently.

8    **Q**    Okay.  And did you have an opportunity to -- in your

9    investigation, do you know if Mr. Al Maliki has any family

10   ties to the Northern District of Ohio?

11   **A**    As far as I know, he doesn't have any family here.

12              MR. SULLIVAN:  Okay.

13        Thank you.

14        I have nothing further.

15              THE COURT:  Okay.  Cross-examination?

16              MR. JACK:  Thank you, Judge.

17                    **CROSS-EXAMINATION**

18   **BY MR. JACK:**

19   **Q**    Good morning.

20   **A**    Good morning.

21   **Q**    How long ago did these offenses take place in Syria

22   that you described?

23   **A**    It would have been August of 2010.

24   **Q**    And when was your first involvement with these

25   offenses?

1    **A**    We received the investigative lead in approximately

2    October of 2010.

3    **Q**    So the offenses allegedly took place in August and you

4    got informed in October of that year?

5    **A**    Correct.

6    **Q**    And when did you first travel -- did you travel to

7    Syria?

8    **A**    No, I did not.

9    **Q**    Okay.  The children, how old were they at the time of

10   the offenses?

11   **A**    The oldest child would have been about 12 and the

12   youngest child would have been about three.

13   **Q**    Okay.  Has there been any interviews or conversations

14   with the three-year old?

15   **A**    No.

16   **Q**    Has there been any interviews or conversations with

17   the 12-year old by government-type agents?

18   **A**    Yes.

19   **Q**    You?

20   **A**    No.  He was interviewed by a child forensic interview

21   specialist.

22   **Q**    Where at?

23              MR. SULLIVAN:  Judge, can we just approach for

24   one second?

25              THE COURT:  Yeah.

1          (Off-the-record bench conference held)

2                    MR. JACK:  Let me withdraw that question and

3      ask it a different way.

4      **BY MR. JACK:**

5      **Q**    Where were the agents from that interviewed the

6      12-year old?  What government agencies were they from?  Were

7      they from Syria?  America?

8      **A**    From the Department of Homeland Security, my agency,

9      Immigration and Customs Enforcement.

10     **Q**    Okay.  Do you know if there were agents in Syria that

11     interviewed the children?

12     **A**    He was interviewed by someone from the embassy, with a

13     translator there in Damascus, Syria at the embassy.

14     **Q**    An American at the American Embassy in Syria

15     interviewed the 12-year old, is that your -- is that what

16     you're saying?

17     **A**    I'm not sure if she's an American citizen, but

18     she's -- she was an employee of the embassy and there was --

19     there was a translator as well that assisted with obviously

20     the interview in Arabic.

21     **Q**    Okay.  To your knowledge, how many people have

22     interviewed the 12-year old?

23     **A**    Just two.

24     **Q**    That would be this individual from the embassy and

25     yourself?

 1    **A**    And the child interview forensic specialist.

 2    **Q**    The child -- from Homeland Security?

 3    **A**    Correct.

 4    **Q**    Are there written statements, recorded statements of

 5    these interviews?

 6    **A**    Yes, there are.

 7    **Q**    The mother, have you interviewed the mother?

 8    **A**    Yes, I have.

 9    **Q**    You personally interviewed the mother?

10    **A**    Yes.

11    **Q**    Do you know how many other government-type agents have

12    interviewed the mother?

13    **A**    So she gave a couple of statements to the vice consul

14    at the embassy there in Damascus, Syria.  I have interviewed

15    her.  As far as I know, there haven't been any other

16    interviews with any, you know, government agencies or

17    government entities.

18    **Q**    So you're thinking about three?

19    **A**    Something like that perhaps.

20    **Q**    And you have read and seen all of these statements,

21    they're recorded in some fashion?

22    **A**    They're written, yes.

23    **Q**    The offenses that you described, the attempted anal

24    penetration of the 12-year old, and the three-year old took

25    place on the same day at the same time?

1    **A**     No.  They were on different days.

2    **Q**     Oh, they were on different days?

3    **A**     Correct.

4    **Q**     How many days apart approximately?

5    **A**     Maybe a week apart, somewhere around that timeframe.

6    **Q**     Okay.  I heard you say something, and I apparently

7    misunderstood, something about five minutes later.

8         What -- I misunderstood what you said I think.

9    **A**     Sure.

10        The five-minute-later incident was with the oldest

11   child where Mr. Al Maliki again attempted anal penetration

12   with the oldest child again.

13   **Q**     Okay.  So, as I understand your testimony, there was

14   this attempt to have anal penetration that the child

15   screamed or something, the mother came into the room, then

16   left with the child or -- what was the second incident?

17   What happened in the second incident?

18   **A**     That he, again, just took the child into a -- another

19   room and attempted the anal penetration.

20   **Q**     Five minutes later?

21        And then, a week later was this incident about the

22   milk with the three-year old?

23   **A**     Yes.

24        Again, I would have to look to tell you exactly, you

25   know, the -- the days, but it's somewhere around that

1    timeframe.

2    **Q**     Okay.  That's fine.  It doesn't have to be exact.

3          Witnesses to these incidents, I assume there's the

4    mother and the 12-year old child?

5          Regarding the 12-year old, there's the mother and the

6    12-year old child.

7          Any other witnesses to these -- that incident?

8    **A**     There were actually three Iraqi women whose apartment

9    they stayed in who witnessed these incidents.

10   **Q**     These are Iraqi women, but we're talking about Syria?

11   **A**     Correct.

12         They -- I believe -- it's my understanding that they

13   were refugees and they were living in Syria at the time.

14   **Q**     So there's three other witnesses in addition to the

15   mother?

16   **A**     Correct.

17   **Q**     And the -- and the 13 year -- or 12-year old.

18         Any other witnesses that you're aware of?

19   **A**     Not that I'm aware of.

20   **Q**     All right.  This incident with the three-year old, how

21   many witnesses are there to that?

22   **A**     The oldest child witnessed that.

23   **Q**     Oldest child witnessed that?

24   **A**     Yes.

25   **Q**     I believe you said that another woman intervened and

1   took the child, took the three-year old from doing it.

2        Who's that person?

3   **A**    It's one of the three Iraqi women.

4   **Q**    All right.  It was -- that was a witness to the

5   incident with the 12-year old --

6   **A**    Correct.

7   **Q**    -- that was living in the apartment --

8   **A**    Correct.

9   **Q**    -- in Syria?

10       The -- the charge in this case is that he traveled to

11  Syria to -- with the purpose to commit this offense --

12            MR. SULLIVAN:  Objection.

13       Not sure if he's asking for a legal opinion.

14       That's actually not the charge, Judge.  There's no --

15  the charge doesn't require an intent prior to travel to

16  engage in sex.  There -- the charge actually just requires

17  travel in foreign commerce and engaging in illicit sexual

18  conduct.  It doesn't have to be the intention at the time of

19  the travel.

20            THE COURT:  All right.  Well, you can go just

21  by the Indictment I guess.

22            MR. JACK:  Yeah.

23  **BY MR. JACK:**

24  **Q**    Do you have any knowledge or evidence that my client

25  traveled to Syria with the intent to commit sexual offenses

1    against these children?

2    **A**    I mean, I can't say what his intent is or isn't.

3    **Q**    But do you know of any is my question?

4    **A**    Again, you know, there's no way I can ascertain what

5    someone's intent is when they travel.

6    **Q**    Nobody told you?  Nobody made a statement to you that

7    he intended to travel there for that purpose?

8    **A**    Correct.  He did not tell me that he intended to

9    travel for that purpose.

10   **Q**    Was there an investigation or criminal charges brought

11   by Syrian officials against my client as opposed to American

12   officials?

13   **A**    No.

14   **Q**    Do you know the reason for that?

15   **A**    It's my understanding that law enforcement is not

16   necessarily all that open to filing charges against men

17   there.

18   **Q**    So, to your knowledge, was there any kind of

19   investigation opened with the Syrian officials?

20   **A**    No.

21   **Q**    Officials from any other country other than the United

22   States, was there any type of investigation into these

23   charges?

24   **A**    No.  It was -- the embassy referred it to us because

25   he was a U.S. citizen.

1    **Q**     The wife, what is her name?

2    **A**     Hinda El Rhannai [phonetic].

3    **Q**     Is there some question about the marriage -- the

4    initial marriage between the husband and the -- or the

5    defendant and the wife?

6    **A**     I -- what I know is that they were married in an

7    Islamic ceremony initially and then were married in -- I

8    believe in September of 2000 and they have a marriage

9    certificate in -- from -- issued from Cuyahoga County.

10   **Q**     Okay.  So he was married in Cleveland?

11   **A**     Correct.

12   **Q**     Have they been divorced?

13   **A**     As far as I know, they are not divorced.

14   **Q**     Did she give any indication why she is not divorced?

15   Why they are not divorced?

16   **A**     No.  All I know is that he instructed -- Mr. Al Maliki

17   instructed his wife to travel to Syria and to wait there and

18   it was her impression that he was following through with the

19   paperwork that needed to be filed so that she could become a

20   resident as well of the United States.

21   **Q**     Did you have any concerns that the wife, who's

22   separated, was bringing allegations merely to get an

23   advantage in the divorce proceedings?

24   **A**     No.  You know, she was -- when she went to the embassy

25   in Damascus, the vice consul there, Mark Goldrup, he

1    physically observed bruises on her legs and that she was

2    having difficulty in walking, which is consistent with, you

3    know, the allegations of physical abuse.

4    **Q**     You didn't get any indication that she was trying to

5    get an advantage by having -- having the defendant placed in

6    custody for divorce purposes or for spiteful reasons?

7    **A**     No.  And in fact, she's never mentioned to me about

8    divorce proceedings.

9    **Q**     Okay.  Is there any DNA evidence of any of these

10   crimes?

11   **A**     Not that I'm aware of.

12   **Q**     Is there any other scientific-type reports or

13   information or investigations relative to these offenses?

14   **A**     Not that I'm aware of.

15   **Q**     How long -- I believe the timeframe you said was these

16   allegations against the 12-year old took place in about

17   August of 2010 and that you became involved or the embassy

18   became involved in October of 2010.

19        When was the first statement taken from the 12-year

20   old?

21   **A**     Let's see, it's actually in another folder, but I want

22   to say somewhere around -- between October and maybe

23   December was when he was interviewed.

24   **Q**     Okay.  So he's not interviewed until months after this

25   incident, is that fair to say?

1    **A**     That's my recollection, but I can't say with a hundred

2    percent certainty.

3                   MR. JACK:  Can I have a moment, Judge?

4                   THE COURT:  Sure.

5                        (Pause in Proceedings)

6                   MR. JACK:  Nothing further.

7          Thanks, Judge.

8                   THE COURT:  Okay.  Redirect?

9                   MR. SULLIVAN:  Briefly.

10         Thank you, Judge.

11                        **REDIRECT EXAMINATION**

12   **BY MR. SULLIVAN:**

13   **Q**     Agent, I just want to go back to the -- to ask you

14   some questions about the -- who interviewed the -- the

15   oldest child.

16         So just to be clear, so you indicated that he was

17   interviewed at the embassy?

18   **A**     Correct.

19   **Q**     Okay.  And then, he was interviewed by a child victim

20   specialist from your agency?

21   **A**     Correct.

22   **Q**     All right.  And then, you have met with him, have you

23   not?

24   **A**     Yes, I have.  I have.

25   **Q**     Okay.  So, actually, he's been interviewed -- I mean,

1    you also have talked to him about the allegations?

2    **A**    Yes.  That's correct.

3    **Q**    And that was at a meeting with an attorney from

4    Washington and myself, correct?

5    **A**    Yes.  That is correct.

6    **Q**    All right.  And then, you also -- there was some

7    indication about Mark Goldrup at the embassy?

8    **A**    Yes.

9    **Q**    And you indicated that he had met with the wife and

10   had noted bruising on her legs and her difficulty walking?

11   **A**    That's correct.

12   **Q**    All right.  Did he also have an opportunity to meet

13   with at any point Mr. Al Maliki?

14   **A**    Yes, he did.

15   **Q**    And can you tell us, based on your conversations with

16   Mark Goldrup, what was his impression of Mr. Al Maliki?

17   **A**    He stated, in his words, that he felt Mr. Al Maliki

18   was duplicitous.

19              MR. SULLIVAN:  Okay.

20         Thank you.

21         I have nothing further.

22              THE COURT:  I'm curious, are both children

23   citizens of the United States?

24              THE WITNESS:  Yes, they are.

25              THE COURT:  The wife?

1              THE WITNESS:  She is not.

2              THE COURT:  Okay.  All right.  You may be

3     excused.

4          Do you want to call your next witness?

5              MR. SULLIVAN:  Judge, we have no further

6     witnesses.

7              THE COURT:  Okay.

8              MR. JACK:  No witnesses, Judge.

9          But I would like to make a proffer.

10             THE COURT:  Okay.  Is this a statement you're

11    going to make?

12             MR. JACK:  Yes.

13             THE COURT:  Okay.

14             MR. JACK:  I don't intend on calling any

15    witnesses or the defendant.

16             THE COURT:  I understand.

17          Go ahead.

18             MR. JACK:  Thank you, Judge.

19          Malek has been a resident of Cleveland, Ohio since

20    about 1992.  He came here as a refugee because he's from

21    Iraq.  He was born and raised in Iraq.  And in his 30s,

22    after the war in 1992, he came here as a refugee.  He's been

23    here ever since.

24          He owns his home, his own home in Cleveland.  Not only

25    does he own it, it doesn't have any mortgage on it.  So I

1    think, in terms of risk of flight, that that weighs

2    significantly against it, because unlike some people who may

3    own a house but the mortgage encumbers the whole balance,

4    they wouldn't lose much by fleeing.  He would.  He owns a

5    home and it's paid for.

6         He also receives social security.  He's disabled as a

7    result of basically three different car accidents and he

8    receives $900 a month.  If he would flee, he would leave --

9    lose that income on a monthly basis, so I think it weighs

10   against that.

11                  THE COURT:  I thought that no matter where

12   they reside, they would collect their SSI?

13                  MR. JACK:  Well, I think -- I think an

14   implication that the Government is making, they're afraid

15   that he's going to go overseas.

16                  THE COURT:  Yeah.  Well --

17                  MR. JACK:  So --

18                  THE COURT:  Because I know people collect

19   social security overseas when they're over there.

20                  MR. JACK:  But if he flee -- it just doesn't

21   seem to make sense that he would give an address where he

22   went, no matter where he went.

23                  THE COURT:  All right.

24                  MR. JACK:  That's kind of the point I was

25   making.

1          He has no -- no involvement with any kind of drugs in

2      his lifetime.

3          As far as a danger to the community, I don't see he's

4      a danger to the community at all.  I don't think there's

5      been any evidence or testimony.

6          The issue here would be a flight risk, I would think

7      would be the Court's major concern.

8                    THE COURT:  Uh-huh.

9                    MR. JACK:  And he has no priors.  He has no --

10     he has two driving under suspensions, a long time ago, 1997.

11     Those are the only two offenses that he has.  No contempts.

12     Not failed to appear for any court appearances.

13         I'm asking that you impose some type of a bond.

14         Thank you.

15                    THE COURT:  Does he have any family ties in

16     Cleveland?

17                    MR. JACK:  Not much, Judge.

18                    THE COURT:  Okay.  Okay.

19         Thank you.

20                    MR. JACK:  Uh-huh.

21                    THE COURT:  You may proceed.

22                    MR. SULLIVAN:  Thank you, Judge.

23         Judge, first of all, I --

24                    THE COURT:  Let me ask, is that your closing

25     argument, too?

1                    MR. JACK:  Yes.

2                    THE COURT:  Okay.  I just want to make sure.

3          Go ahead.  I'm sorry.

4                    MR. SULLIVAN:  That's okay.

5          Thank you.

6          All right.  Judge, as you know, the two charges for

7    which the defendant has been indicted both carry a statutory

8    presumption for detention, so there is a statutory

9    presumption.

10                   THE COURT:  Rebuttable presumption.

11                   MR. SULLIVAN:  Rebuttable.

12         But still a presumption that no condition or

13   combination of conditions could assure the safety of the

14   community or his appearance.

15         And it would be the Government's position that

16   presumption has been strengthened and not rebutted during

17   the course of this hearing.

18         In this case, we have a man with absolutely no ties,

19   not only to the Northern District of Ohio, but really no

20   ties to the United States.

21         He does own his home in Cleveland, but as you can see

22   from the Pretrial Services' report, he -- it apparently is

23   not in very good shape.  The tax records say that it's worth

24   $51,000 and Mr. Al Maliki says it's only worth about

25   $20,000.  So, clearly, it is not a home that's in good

1    shape.  It is not an overly valuable home.

2         Mr. -- and as Your Honor pointed out, he still can

3    collect his social security when overseas and he certainly

4    demonstrated that over the past year, when he was gone

5    almost for the entire year of 2012 and was still collecting

6    his SSI.

7         Additionally, Mr. Jack says it's unlikely that he

8    would give an address overseas, but I'm pretty sure that the

9    countries from which Mr. Al Maliki hails and resides do not

10   have really a friendly extradition with the United States,

11   so there would not be much fear of him staying where he was,

12   if he was in Syria or Iraq, because we wouldn't be able to

13   get him back.

14        So the evidence has demonstrated that we have a man

15   who travels at length and repeatedly overseas.  We have --

16   there has been some evidence that he is somewhat -- I'm not

17   sure of the right term -- but he has some issues with

18   passports, according to the statement made by his wife.  He

19   plays around with passports and is somewhat deceitful with

20   them.

21        We have evidence from his neighbors that he, again, is

22   gone for large periods of time and it's confirmed by his

23   travel records, which shows that he travels regularly.

24        It's a case that carries a very lengthy potential jail

25   sentence.  He's facing up to 30 years on each count as

1    charged.  It's a very serious offense involving his --

2    sexual abuse of his two minor -- attempted sexual abuse of

3    one child and the abuse of the other.

4         But mostly, Judge, it's a -- the issue here is that he

5    has absolutely no ties.  He's got no employment here.  He's

6    got no ties to the -- to this community, other than his

7    home.  He's got extensive ties outside of the country.  He

8    is originally from the Middle East and regularly travels

9    there.

10        So it would be the Government's position that the

11   statutory presumption has certainly not been rebutted, it's

12   been strengthened in this case, and we would ask you to

13   order his detention.

14                THE COURT:  Is there a mandatory minimum on

15   this case?

16                MR. SULLIVAN:  There is not a mandatory

17   minimum.

18                THE COURT:  Okay.  Just curious.

19        Do you want to respond?  Since I don't know whether --

20   you know, you pretty much had your closing argument, but you

21   may want to add something.

22                MR. JACK:  Just briefly, Judge.

23        I think, since he's not employed, house arrest would

24   be an alternative that would give the Government a little

25   more -- a little more assurance of appearance and better

1    monitoring for him.

2         And -- and I would suggest that that may be a

3    reasonable alternative for the Court.

4                 THE COURT:  Okay.

5         Thank you.

6         All right.  I -- I realize he doesn't have an

7    extensive criminal record, if you want to even call it a

8    criminal record; however, I -- I believe he is a risk of

9    flight.

10        Because of the rebuttable presumption, which has not

11   been overcome, and his ties to the U.S. are minimal, and he

12   even claims the house is only worth 20-some thousand

13   dollars, I mean, if you're looking at 30 years on each

14   count, I mean, I don't think $20,000 would be an incentive

15   to stay in this country.

16        And I -- I am concerned whether, if he does go to Iraq

17   or Syria, well, I don't think he'll go to Syria, but if he

18   goes to Iraq, extradition could be rather difficult, it's my

19   understanding, so I think there's a strong argument that

20   he's a risk of flight.

21        Danger to the community, that's minimal.  I'm not sure

22   that I would accept that argument.

23        But I do believe that he is a risk of flight, so,

24   therefore, I'm ordering him detained and remand him to the

25   custody of the U.S. Marshals.

1      And we are adjourned.

2             COURTROOM DEPUTY:  All rise.

3                    - - -

4         (Proceedings concluded at 9:56 a.m.)

5

6

7

8              **C E R T I F I C A T E**

9

10     I certify that the foregoing is a correct transcript

11  from the record of proceedings in the above-entitled matter.

12  This transcript was prepared to the best of my ability from

13  a digital audio recording of the proceedings provided by the

14  Court.

15

16         */s/ Sarah E. Nageotte*              *4/26/2013*
          SARAH E. NAGEOTTE, RDR, CRR, CBC          DATE
17

18

19

20

21

22

23

24

25